UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ESMOND L. SANFORD,<br><br>           Plaintiff,<br><br>     v.<br><br>MADISON COUNTY JAIL, DONALD BUNT, GARY BOST, ROBERT HERTZ, SHERIFF JOHN D. LAKIN, MAYNARD HILL, ROBERT HOLLENBECK, MADISON COUNTY, ILLINOIS,<br><br>           Defendant. | Case No. 14-cv-566-JPG-SCW |

## MEMORANDUM AND ORDER

This matter comes before the Court on the Report and Recommendation ("Report") (Doc. 116) of Magistrate Judge Stephen C. Williams recommending that the Court grant in part and deny in part the defendant's motion for summary judgment (Doc. 82). All parties have objected to the Report (Docs. 122, 123 & 124) and have responded to their adversaries' objections (Docs. 125, 126, 128 & 130).

**I.     Report Review Standard**

The Court may accept, reject or modify, in whole or in part, the findings or recommendations of the magistrate judge in a report and recommendation. Fed. R. Civ. P. 72(b)(3). The Court must review *de novo* the portions of the report to which objections are made. *Id.* "If no objection or only partial objection is made, the district court judge reviews those unobjected portions for clear error." *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999).

**II.    Background**

Sanford filed this lawsuit because of events and conditions that occurred while he was a

pre-trial detainee at the Madison County Jail from August 2, 2013, to August 13, 2014.

Remaining in this case are:

> Count I: a claim against defendants Bost, Bunt and Hertz (in his individual and official capacities) for unconstitutional conditions of confinement due to an unhealthy diet;
>
> Count II: a claim against defendants Bost, Bunt, Hill and Hertz in their individual capacities for unconstitutional conditions of confinement due to cold showers in a cold facility;
>
> Count III: a claim against defendants Bost, Bunt, Hill, Hollenbeck and Hertz (in his individual and official capacities) for unconstitutional conditions of confinement due to lack of exercise;
>
> Count IV: a claim against defendant Hertz in his official capacity for unconstitutional conditions of confinement due to routinely cold cells; and
>
> Count V: a claim against defendants Bost, Bunt and Hertz in their individual capacities for deliberate indifference to medical safety due to Hepatitis-C exposure.

Defendant Madison County remains a party solely to fund any judgment against the Sheriff of Madison County in his official capacity. The Court further notes that Hertz is no longer the Sheriff of Madison County. *See* http://www.co.madison.il.us/departments/sheriff/ (visited Feb. 28, 2017). Accordingly, pursuant to Federal Rule of Civil Procedure 24(d), the Court substitutes the new Sheriff, John D. Lakin, as defendant in Sanford's official capacity claims.

**III.   Report and Objections**

As a preliminary matter, the Court has reviewed the legal standards Magistrate Judge Williams sets forth in the Report and finds them to be correct and not in need of repetition in this order.

A.   <u>Count I: Jail Diet</u>

Magistrate Judge Williams recommended the Court grant summary judgment for

2

defendants Bost, Bunt, Hertz and Lakin on Count I.   In this count, Sanford claims that the jail served him foods high in salt and sugar, which contributed to his high blood pressure and weight gain, and that Bost and Bunt ignored his requests for a different diet.   Instead, the healthcare unit gave him blood pressure medicine on and off as needed.

Magistrate Judge Williams found no evidence that the jail's diet posed an objectively serious harm to Sanford, who had been diagnosed with high blood pressure long before he arrived at the jail, although he was not taking blood pressure medicine at the time of his arrival.   He was given medication within days of his arrival when his high blood pressure was detected, medical staff monitored his blood pressure throughout his detention, and the blood pressure medication was discontinued when his blood pressure reached the normal range in May 2014 and then reinstated when it was found to be high again in July 2014.

Magistrate Judge Williams also found no evidence that Bost or Bunt, non-medical jail employees, were deliberately indifferent to Sanford's blood pressure needs where his blood pressure was being monitored and treated by healthcare unit personnel, who did not request a special diet for Sanford.

Magistrate Judge Williams further found there was no evidence Hertz was personally involved in or had personal knowledge of the actions of his subordinate with respect to Sanford's blood pressure or his diet.   In other words, there was no evidence Hertz actually knew of and disregarded Sanford's dietary complaints.   Additionally, Magistrate Judge Williams found there could be no official capacity liability absent an underlying constitutional violation.

      1.    <u>Bost and Bunt</u>

Sanford objects to the finding that the jail's diet did not pose an objectively serious risk to Sanford's health.   He points to the sodium, fat and sugar content of the breakfast provided every

3

day during his detention, which he claims is high. He also points to the fact that he was not on blood pressure medication and was not experiencing problems associated with high blood pressure when he arrived at the jail in support of his argument that his need for medication arose during his detention. He also points to his gaining nearly 40 pounds in the first month of his detention, which he believes should have alerted Bost and Bunt that there was a problem with his diet, and the beginning of symptoms (headaches, dizziness and an irregular heartbeat) associated with high blood pressure.

Sanford also objects to the finding that no evidence shows Bost and Bunt were deliberately indifferent to the harm the jail diet posed to Sanford. He points to his unanswered complaints to Bost and Bunt about the impact of the jail meals on his health and the lack of any evidence that Bost or Bunt actually knew Sanford was being treated by jail's medical staff or investigated his complaints with that staff.

Having conducted a *de novo* review of the matter, the Court agrees with Magistrate Judge Williams. It is true that the evidence shows that the jail's diet may contain a fair amount of salt and sugar and that Sanford believed the diet was harming his blood pressure and causing adverse symptoms. However, there is no evidence from which a reasonable jury could determine the salt and sugar content caused or exacerbated his pre-existing high blood pressure or caused symptoms. Sanford showed up at the jail with high blood pressure (although he was not treating it at the time), was given medication to control it, and was monitored throughout his detention. Under such medical care, no reasonable jury could find the diet served to Sanford at the jail posed an objectively serious risk to his health.

This is especially true considering the nature of high blood pressure as noted by medical authorities, as the Court was encouraged to consider in *Jackson v. Pollion*, 733 F.3d 786, 789 (7th

Cir. 2013). Information from the Mayo Clinic suggests Sanford's speculation about the symptoms caused by his high blood pressure is unfounded:

> Most people with high blood pressure have no signs or symptoms, even if blood pressure readings reach dangerously high levels.
> A few people with high blood pressure may have headaches, shortness of breath or nosebleeds, but these signs and symptoms aren't specific and usually don't occur until high blood pressure has reached a severe or life-threatening stage.

Mayo Clinic, High blood pressure (hypertension), Symptoms, http://www.mayoclinic.org/ diseases-conditions/high-blood-pressure/basics/symptoms/con-20019580 (visited Feb. 28, 2017). Here, Sanford testified that he controlled his blood pressure by diet and exercise before he was detained, and when he was detained, his blood pressure was only marginally high. The upper limit of normal blood pressure is 139/89, *see* Mayo Clinic, High blood pressure (hypertension), Tests and diagnosis, http://www.mayoclinic.org/diseases-conditions/ high-blood-pressure/basics/tests-diagnosis/con-20019580 (visited Feb. 28, 2017); *see also Jackson*, 733 F.3d at 788 ("'Ideal'" blood pressure is considered to be below 120/80, but the top of the normal range is 140/90."). Sanford's readings in his first week at the prison were 158/100, 138/100 and 137/88, and his blood pressure was controlled through medication as needed thereafter for the approximately one year he was detained. He was clearly not at a "severe or life-threatening stage" where symptoms were likely to emerge. No reasonable jury could find based on these facts that Sanford's diet caused him headaches, dizziness and an irregular heartbeat or, indeed, any serious impact on his health long-term.

Additionally, no reasonable jury could find based on the evidence in the file that Sanford's approximate 40-pound weight gain in one month was attributable to the diet served by the jail. In fact, it is virtually impossible for that to have occurred. The evidence shows the jail's diet complied with the Illinois County Jail Standards, 20 Ill. Admin. Code § 701.110(a)(1), which

5

required a minimum of 1800 to 2000 calories per day for an adult. Sample menus show the daily diet at the jail contained between 2,000 and 3,000 calories. The Mayo Clinic teaches that "3,500 calories equals about 1 pound." Mayo Clinic, Weight loss, Counting calories: Get back to weight-loss basics, http://www.mayoclinic.org/healthy-lifestyle/weight-loss/in-depth/calories/art-20048065 (visited Feb. 28, 2017). Thus, for Sanford to have gained 40 pounds, he would have had to have consumed 140,000 calories more than the energy he expended. For him to have done so in one month, he would have had to have consumed 4,666 calories a day over the energy he expended. Considering he expended at least 2,300 calories per day just existing and eating[1], he would have had to have consumed approximately 6,966 calories a day to have gained 40 pounds in a month. In light of the evidence of what was actually served at meals, no reasonable jury could believe the jail actually fed Sanford more than three times the mandated number of calories.[2] Sanford is patently incredible when he claims to have gained 40 pounds in

---

[1] The Mayo Clinic states,

> Even when you're at rest, your body needs energy for all its "hidden" functions, such as breathing, circulating blood, adjusting hormone levels, and growing and repairing cells.
> The number of calories your body uses to carry out these basic functions is known as your basal metabolic rate — what you might call metabolism.

Mayo Clinic, Weight loss, Metabolism and weight loss: How you burn calories, http://www.mayoclinic.org/ healthy-lifestyle/weight-loss/in-depth/metabolism/art-20046508 (visited Feb. 28, 2017). Using the Mayo Clinic's tool for estimating the basal metabolic rate of an inactive 38-year-old man weighing 178 pounds, Sanford's condition when he was first detained, the Court finds that Sanford expended approximately 2,200 calories a day simply existing. *See* Mayo Clinic, Healthy Weight Pyramid, http://www.mayoclinic.org/healthy-lifestyle/weight-loss/in-depth/weight-loss/itt-20084941 (visited Feb. 28, 2017). He also used anywhere from 100 to 800 calories a day to eat and digest his food. Mayo Clinic, Weight loss, Metabolism and weight loss: How you burn calories, *supra*.

[2] This does not mean Sanford did not actually gain the weight he claims to have gained. It just means it was not caused by the jail diet but from other sources like, for example, commissary snacks. *See* Prison Trust Fund Account Statement (Doc. 19 at 2) (showing a pattern of regular purchases from the jail store in 2014).

one month because of jail meals, and it is completely unfounded to connect any weight gain to Sanford's blood pressure.

Finally, as the Seventh Circuit realized in *Jackson*, unless extremely high, mild high blood pressure generally causes harm over a long period of time. *Jackson*, 733 F.3d at 789 (quoting 2 Dan J. Tennenhouse, *Attorneys Medical Deskbook* § 24:4 (4th ed. 2012) ("The *prolonged* elevation of either the systolic or the diastolic blood pressure causes damage. If *mildly* elevated over a *long* period of time, or if *highly* elevated over a *short* period of time, damage results to a variety of different 'target' organs in the body, primarily due to arterial injury." (emphasis added)). No evidence suggests the diet Sanford received for the approximately one-year period while detained in the jail, while simultaneously being treated with high blood pressure medication and after having controlled his blood pressure with diet and exercise prior to detention, would have damaged any organs or had any other adverse effect on his health.

Additionally, the Court agrees with Magistrate Judge Williams that no reasonable jury could find Bost or Bunt was deliberately indifferent to Sanford's needs. While it is true that there is evidence Sanford told Bost and Bunt of his speculation that the jail's diet was causing him medical problems, there is no evidence in the record they actually knew of any non-speculative danger posed to Sanford from the jail's diet (which, as explained above, did not exist). This is not a case – like a gaping, bloody wound – where it would have been clear to non-medical personnel that medical assistance was needed. Additionally, it was a policy for incoming detainees to be subjected to an intake examination shortly after their arrival at which the jail medical staff could identify chronic problems like high blood pressure and devise a treatment plan. Bost and Bunt were entitled to rely on this policy to bring chronic, non-emergent medical problems to the attention of the appropriate medical personnel. Bost and Bunt are not medical personnel and are

7

not responsible for making medical decisions such as ordering a special diet. They are entitled to rely on the jail's medical staff, which were readily available to and in regular contact with Sanford, to tend to Sanford's blood pressure as they deemed appropriate. Indeed, Sanford testified he was able to request a special diet from healthcare personnel, but they declined to order it. To the extent either Bost or Bunt told Sanford he was "on top of it" when Sanford complained, yet did nothing, nothing suggests that they were more than merely negligent, which will not support a constitutional claim.

        2.      <u>Hertz</u>

To the extent Count I is against Hertz in his individual capacity based on his own personal conduct, Sanford does not object to the finding that there is no evidence Hertz knew about any of the dietary problems Sanford alleges. Therefore, he could not have been deliberately indifferent to Sanford's need in this regard. Magistrate Judge Williams's recommendation to grant Hertz summary judgment on Count I is not clearly erroneous,.

        3.      <u>Lakin</u>

Sanford objects to the recommendation for summary judgment on Count I against Lakin in his official capacity as Sheriff of Madison County. He argues that Bost's and Bunt's failure to follow up on Sanford's dietary complaints demonstrate inadequate training by the Sheriff or a custom of ignoring detainee complaints.

For the reasons set forth earlier in this order, no reasonable jury could find any policy regarding the diet provided by the jail, in combination with the healthcare services provided by the jail, was inadequate for Sanford's medical needs. Additionally, since Bost and Bunt were not deliberately indifferent to Sanford's needs, there can be no failure to train or custom claim based on such actions. Even if they had been deliberately indifferent, no evidence suggests such

conduct was the product of a policy or custom of the Sheriff rather than just an individual failing.

For these reasons, the Court will adopt the Report as to Count I and will grant summary judgment on that count to defendants Bost, Bunt, Hertz and Lakin.

B.   Count II:   Cold Temperatures and Cold Showers

Magistrate Judge Williams recommends the Court deny summary judgment for defendants Bost, Bunt, Hill and Hertz on Count II.   In that count, Sanford complains that the cellhouse in which he was housed was too cold from February through April 2014 and that the cells and showers had no hot water for two weeks in February and March 2014.   Sanford estimates the air temperature in the cellhouse was in the 50s (Fahrenheit).   He claims it was so cold his hands and feet were numb and turned colors, he was not given a sufficient blanket, and he was not allowed to wear socks.   He complained to Bost, Bunt, Hill and Hertz about the problems but received no response.

Magistrate Judge Williams found that there was a genuine issue of material fact about whether the air temperature in the cell block was too cold during the relevant months:   Sanford testified that in his opinion it was in the 50s from February to April 2014; the defendants presented evidence it was in the 70s in July and August 2014.   Magistrate Judge Williams further found that a reasonable jury could find Bost, Bunt, Hill and Hertz knew from Sanford's complaints about the alleged excessively cold temperatures for extended periods, but ignored the problem.

With respect to the lack of hot water, Magistrate Judge Williams also found a genuine issue of fact for trial.   The defendants admitted the water heater for the cellhouse was broken from February 28 to March 19, 2014, so detainees in Sanford's cellhouse only had access to cold or lukewarm water during that time.   Magistrate Judge Williams found an issue of fact whether, as the defendants contend, Sanford was allowed to take a hot shower regularly in another cellhouse

or, as Sanford contends, he was only allowed to do so once, the day before the water heater was fixed. Magistrate Judge Williams concluded that a reasonable jury could find Sanford's cold cell and the lack of hot water together denied Sanford the minimal civilized measure of life's necessities, so summary judgment was not warranted on Count II.

### 1. Bost, Bunt and Hill

These defendants do not object to the Report with respect to Count II. The Report is not clearly erroneous in its analysis of Count II against Bost, Bunt and Hill, so the Court will adopt that part of the Report and deny summary judgment for Bost, Bunt and Hill on Count II.

### 2. Hertz

Hertz objects on the grounds that even if the air temperature was in the 50s, as Sanford claims, it could not be unconstitutional because it was not inhumane, but merely uncomfortable, and did not cause him any injury. Similarly, he argues that hot water and hot showers, at least more than once a week, are not one of the minimal civilized measures of life's necessities. Finally, Hertz argues there is no evidence he actually knew that the cold temperatures and lack of hot water posed an unacceptable risk to Sanford's health or safety.

The Court agrees with Magistrate Judge Williams that, balancing the relevant factors set forth in *Dixon v. Godinez*, 114 F.3d 640, 643 (7th Cir. 1997), a reasonable jury could find that keeping Sanford's cell temperature in the 50s for three months without adequate clothing or bedding for him to keep warm and without access to hot water or hot showers deprived him of the minimal civilized measure of life's necessities. The case of *Dace v. Smith-Vasquez*, 658 F. Supp. 2d 865 (S.D. Ill. 2009), where there was found to be no constitutional violation based on cold temperatures, is distinguishable from the case at bar. In *Dace*, unlike in this case, the cold temperatures lasted only three weeks while a heater fan was being repaired, *id.* at 876, the inmate

had winter clothing and bedding to keep him warm, *id.* at 877-78, and there was no indication the inmate did not have access to hot water or hot showers for any of the cold period.

The Court further believes a reasonable jury could find that the temporary numbness and discoloration in Sanford's extremities and the overall severe discomfort Sanford felt could constitute sufficient injury caused by the cold to support a constitutional tort. *See Dixon*, 114 F.3d at 644 ("Cold temperatures need not imminently threaten inmates' health to violate the Eighth Amendment."). If Hertz knew about the cold cells and lack of access to hot water and did not do anything about it, a reasonable jury could find he was deliberately indifferent to Sanford's needs for the minimal civilized measures of life's necessities.

To the extent Hertz argues that he could not have been deliberately indifferent because immediate action was taken to repair the hot water heater, the Court rejects that position. While he may have acted quickly to try to have the water heater fixed, once it became apparent the problem persisted, a reasonable jury could find Hertz was deliberately indifferent to Sanford's needs by failing to allow Sanford to shower in another cellhouse or provide more heat, clothing or blankets in his cell. This was Magistrate Judge Williams's conclusion in the Report, and the Court finds it to be correct.

Because Magistrate Judge Williams correctly found that the cold temperatures in conjunction with the lack of hot showers could reasonably be found to have deprived Sanford of the minimal civilized measures of life's necessities, and that a jury could find Hertz did not reasonably respond to Sanford's plight, Hertz is not entitled to summary judgment on Count II.

C.  Count III:  Exercise

Magistrate Judge Williams recommends denying summary judgment on Count III against Bost, Bunt, Hill and Hollenbeck but granting it for Hertz and Lakin. In this count, Sanford

complains that he was not provided constitutionally sufficient opportunities to exercise during his detention at the jail. He was only allowed access to the yard one time in the year he was at the jail, one day in October 2013 during a shake-down of his cellhouse. Otherwise, he could only exercise in his cell, which was too small to do much exercise other than stretching, sit-ups and push-ups, especially with a cellmate also in the cell, or in the dayroom, which was also too small and crowded and where he did not feel safe because of the presence of other inmates with whom he had issues. He complained to Bost, Bunt, Hill and Hollenbeck about the lack of access to the yard but received no response.

     Magistrate Judge Williams weighed the duration of the lack of access to the yard, the reasons for the denial of access, and alternative forms of recreation available to Sanford. He noted the year-long denial of access to the yard (except for one time) with the alternative recreation opportunities only in a small cell with another detainee present or in the dayroom with unspecified frequency and limited open space. He concluded that a reasonable jury could find this amounted to an unconstitutional condition of confinement threatening Sanford's health.

     Magistrate Judge Williams also concluded that a reasonable jury could find Bost, Bunt, Hill and Hollenbeck were deliberately indifferent to Sanford's needs when they received his complaints but did nothing about them. However, he found no evidence that Hertz knew about Sanford's complaints or his conditions or that the yard restrictions were the result of any official policy, which provided for one hour of exercise per day outside of a detainee's cell, preferably outside if weather permitted. For these reasons, Magistrate Judge Williams recommended that Count III against Bost, Bunt, Hill and Hollenbeck go to trial but that summary judgment be granted as to Hertz and Lakin.

1. Bost, Bunt, Hill and Hollenbeck

Bost, Bunt, Hill and Hollenbeck object. They argue that Sanford's opportunities to exercise in his cell and in the dayroom were adequate to mitigate his lack of yard access. They point to *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988), where an inmate was denied yard access for 28 days while he was in segregation but was able to exercise by jogging in place, doing aerobics or doing push-ups in his cell. The in-cell exercise was deemed an acceptable improvised substitute for yard time, in part, because it was for only four weeks and was not "extreme and prolonged." *Id.* ("This was a short-term situation, lasting only four weeks."). *Id.* There was no discussion in that case about the size of the cell or the presence of other inmates or other impediments to exercise in the cell.

The defendants also point to *Merced v. Kamp*, No. 09-cv-241-GPM, 2009 WL 3425684 (S.D. Ill. Oct. 23, 2009). However, the inmate in *Merced* spent less than half the time restricted to in-cell exercise (164 days) than Sanford did, and the restriction was as a consequence of a suspected rules violation. *Id.* at *2. And again, the Court did not discuss whether there were impediments to exercise in the plaintiff's cell.

Neither *Harris* nor *Merced* is persuasive for Sanford's case, where Sanford's deprivation of yard time was for more than a year (except for one day) and where the alternative exercise areas were small and had impediments to exercise such as other people and furniture. It should be up to a jury to determine whether Sanford's exercise opportunities were adequate.

2. Hertz

Sanford does not object to Magistrate Judge Williams's recommendation to grant summary judgment for Hertz based on the lack of his personal involvement with the denial of opportunities to exercise. The Court finds no clear error in the Report as to this claim. It will therefore adopt

13

the Report on this issue and will grant summary judgment for Hertz on Count III.

###### 3. Lakin

Sanford objects to Magistrate Judge Williams's recommendation to grant summary judgment for Hertz in his official capacity (now replaced by Lakin in his official capacity). He acknowledges that the jail's written policy calls for one hour of out-of-cell exercise per day, which should be outside if weather permits. He argues that the custom, however, did not follow the policy for at least the year that Sanford was at the jail, and that jail officials must have noticed the failure to follow the policy yet ignored that failure.

The Court has reviewed the matter *de novo* and finds no evidence that the jail had a widespread custom of restricting exercise activities. As a preliminary matter, Sanford did not argue in his response to the summary judgment motion that there was a widespread custom with respect to yard exercise that would support liability under *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978). Instead, he relied on the theory that the Sheriff failed to train its employees. Therefore, he has waived the argument that there was a widespread custom in contravention of the written jail exercise policy. *See United States v. Melgar*, 227 F.3d 1038, 1040 (7th Cir. 2000) ("[A]rguments not made before a magistrate judge are normally waived."). Even if Sanford had not waived the argument, the evidence only shows that the jail's written policy may not have been observed as to Sanford and those in his cellhouse; it does not show a widespread custom that would amount to official jail policy.

Furthermore, there is no evidence suggesting the jail failed to train its employees to observe the written exercise policy other than the mere fact that they may not have observed it with respect to Sanford's cellhouse. A municipal entity will not be liable for the misconduct of its employees based on a failure to train theory unless there is evidence that there actually was such a

failure. The failure cannot be assumed simply because of an employee's failure to follow the policy. That would be akin to *respondeat superior* liability, which cannot support § 1983 liability. *See Monell*, 436 U.S. at 691-92.

In sum, there is simply no evidence of a widespread custom with the force of official policy or any failure to train jail employees with respect to the exercise policy at the jail. For these reasons, the Court will adopt Magistrate Judge Williams's Report as to this issue and will grant summary judgment for Lakin on Count III.

D. Count IV: Cold Cell

Magistrate Judge Williams recommends denying summary judgment on Count IV. That count is an official capacity claim against Lakin, the Sheriff of Madison County, for the widespread jail practice of maintaining the cellblock at an excessively cold temperature while detainees were not allowed sufficient clothing and bedding to keep warm.

Hertz first objects that he is no longer the Sheriff of Madison County, so he should be granted summary judgment on this official capacity claim. Hertz is correct that he should no longer be a defendant in Count IV, and the Court has achieved that result by substituting Lakin, the current Sheriff of Madison County, as a defendant in all Sanford's official capacity claims.

The Sheriff next argues that this case is moot in light of the fact that Sanford is no longer housed at the Madison County Jail and there is no reasonable expectation he will return there. The Sheriff did not raise this argument in his motion for summary judgment (although Sanford had been transferred from the jail long before the motion was filed), but since the Court's jurisdiction is an issue that cannot be waived, the Court considers this argument.

It is true that Sanford's claims for injunctive relief under Count IV are moot. Transfer of a detainee to a another institution renders the detainee's request for injunctive relief against a jail

moot unless he makes a showing that he will likely be transferred back to the jail. *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996). However, Sanford also seeks monetary relief from the Sheriff for the unconstitutional conditions caused by the Sheriff's official policy regarding cell temperatures. Sanford is permitted to bring such a suit under *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978). *Monell* recognizes that "[l]ocal governing bodies . . . can be sued directly under § 1983 for *monetary, declaratory, or injunctive relief* where . . . the action that is alleged to be unconstitutional implements or executes" an official policy or custom. *Id.* at 690-91 (emphasis added; footnote omitted). Thus, unlike their state counterparts, municipal officials like Sheriffs sued in their official capacities can be liable for money damages for unconstitutional jail policies, and those claims do not become moot upon a detainee's transfer to another institution. Thus, Count IV against Lakin in his official capacity as Sheriff is not moot because Sanford is no longer in the jail, and Count IV should proceed to trial.

Magistrate Judge Williams's Report as to Count IV is otherwise not clearly erroneous, so the Court will adopt it as to Count IV.

  E. Count V: Exposure to Hepatitis C

Magistrate Judge Williams recommends the Court grant summary judgment on Count V as to defendant Hertz but deny it as to defendants Bost and Bunt. Sanford complains in Count V that the defendants were deliberately indifferent to his health by allowing an inmate infected with Hepatitis C to use communal razors while they were in the same cellhouse for 18 days in April and May 2014. At that time, the cellhouse had only one razor that was shared by all inmates, although the jail policy required an infected inmate to be provided with his own razor. Sanford complained to Bost and Bunt, but they did nothing to ensure Sanford was able to use a razor not also used by the infected inmate.

Magistrate Judge Williams concluded that a reasonable jury could find that Bost and Bunt knew the communal razor was being used by the infected inmate such that Sanford would also have to use it in order to shave and risk his health. However, Magistrate Judge Williams recommended granting summary judgment for Hertz because no evidence shows he was aware that there was only one razor for Sanford and the infected inmate.

1. Bost and Bunt

Bost and Bunt object on the basis that they did not know Sanford risked exposure to a communicable disease through the razor. They note that there was one electric razor in the cellhouse and a cleaning solution to sanitize and disinfect the razor after each use to prevent the spread of communicable diseases through sharing the razor. They also note that detainees with communicable diseases are provided with separate razors. Thus, they argue, they did not actually know Sanford faced a health risk, so they could not have been deliberately indifferent to that risk.

For the purposes of summary judgment, the Court must accept Sanford's statement that the infected inmate did not have his own separate razor as called for by jail policy. Bost and Bunt knew this from Sanford's complaint that he had to share a razor with the infected inmate. As for the cleaning solution, the Court finds the defendants have not carried their burden of showing they knew that the solution was actually provided to Sanford's cellhouse, that it was adequate to prevent transmission of Hepatitis C, and that the communal razor was actually sanitized between each use. In the absence of such knowledge, a reasonable jury could find Sanford's complaints about having to share the communal razor with an infected inmate could have made them aware of the potential of contamination, and that their lack of response to his complaints amounted to deliberate indifference. For these reasons, the Court will adopt the Report on this issue and will deny summary judgment to Bost and Bunt on Count V.

2. <u>Hertz</u>

Sanford does not object to Magistrate Judge Williams's recommendation to grant summary judgment for Hertz based on the lack of his knowledge about the communal razor issue. The Court finds no clear error in the Report as to this claim. It will therefore adopt the Report on this issue and will grant summary judgment for Hertz on Count V.

**IV. Conclusion**

For the foregoing reasons, the Court hereby:

- **ADOPTS** the Report in its entirety (Doc. 116);

- **OVERRULES** the parties' objections (Docs. 122, 123 & 124);

- **DIRECTS** the Clerk of Court to add Sheriff John D. Lakin as a defendant in this case for Sanford's official capacity claims brought against Hertz in his official capacity;

- **GRANTS in part** and **DENIES in part** the defendants' motion for summary judgment (Doc. 82). The motion is **GRANTED** to the extent it seeks summary judgment on:
    - Count I against Bost, Bunt, Hertz and Lakin ;
    - Count III against Hertz and Lakin; and
    - Count V against Hertz; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

The following claims remain for trial:

Count II: a claim against defendants Bost, Bunt, Hill and Hertz in their individual capacities for unconstitutional conditions of confinement due to cold showers in a cold facility;

Count III: a claim against defendants Bost, Bunt, Hill and Hollenbeck in their individual capacities for unconstitutional conditions of confinement due to lack of exercise;

Count IV: a claim against defendant Lakin in his official capacity for unconstitutional conditions of confinement due to routinely cold cells; and

Count V: a claim against defendants Bost and Bunt in their individual capacities for deliberate indifference to medical safety due to

Hepatitis-C exposure.

The Court **ORDERS** the parties to submit a proposed final pretrial order to Magistrate Judge Williams's chambers on or before March 24, 2017.

**IT IS SO ORDERED.**
**DATED: March 7, 2017**

                                          s/ J. Phil Gilbert
                                          **J. PHIL GILBERT**
                                          **DISTRICT JUDGE**